Frank BELTON, Appellant,

v.

John P. TRAYNOR, Deputy Commissioner, United States Employees' Compensation Commission, Fifth Compensation District and Liberty Mutual Insurance Company, Appellees.

No. 11094.

United States Court of Appeals
Fourth Circuit.

Argued April 7, 1967.

Decided June 22, 1967.

Ralph Rabinowitz, Norfolk, Va., (Kelsey & Rabinowitz, Norfolk, Va., on brief) for appellant.

Alfred H. Myers, Atty., Dept. of Labor (Charles Donahue, Solicitor of Labor, Neil R. Peterson, Atty., Dept. of Labor, Claude V. Spratley, Jr., U. S. Atty., and James A. Oast, Jr., Asst. U. S. Atty., on brief) for appellee John P. Traynor.

Frederick P. Aucamp (Rixey & Rixey, Norfolk, Va., on brief) for appellee Liberty Mutual Insurance Co.

Before SOBELOFF, BOREMAN and CRAVEN, Circuit Judges.

CRAVEN, Circuit Judge:

Longshoreman Belton, appellant, received considerably less money than he was entitled to have as compensation for injury under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. §§ 901–950. So much is conceded by respondents-appellees, Belton's employer, Old Dominion Stevedoring Company, its insurance carrier, Liberty Mutual, and the Deputy Commissioner, Bureau of Employees Compensation, United States Department of Labor. But Old Dominion, Liberty Mutual, and the Deputy Commissioner strenuously insist that Belton cannot now recover what he was clearly entitled to have because of a statute of limitations contained in the Act. The Deputy Commissioner rejected Belton's claim for additional compensation. On appeal to the district court, the Deputy Commissioner's motion for summary judgment was allowed, and his rejection of the claim affirmed on the ground that neither the claim nor an application for reconsideration was filed within one year after the date of the last payment of compensation. See 33 U.S.C.A. § 913(a).

There is no genuine issue as to any material fact. Belton received leg injuries in the course of his employment with Old Dominion while aboard the Vessel S. S. Mormacpenn on July 17, 1961. He has a sixth-grade education and has been a longshoreman since 1943.

On July 18, 1961, Old Dominion filed the "Employer's First Report to Deputy Commissioner of Accident or Occupational Disease." This report is U. S. Form # 202 required by the United States Department of Labor. Old Dominion reported in item 11 on this form that Belton earned an average of $54.00 per week. His average weekly wage actually was $100.00 per week, of which $78.10 was attributable to work for Old Dominion and the balance from other stevedoring companies.

Belton's claim for compensation was "informally adjudicated" by a conference and no formal compensation order was issued. Two such informal conferences

were held by a claims examiner in the office of the Deputy Commissioner. Belton was represented by a union [1] official at these conferences. At neither of the conferences was there any discussion whatsoever about the average weekly wage of the employee.[2] The record does not indicate that Belton was advised by the Deputy Commissioner or by anyone else that his right to receive compensation was quantitatively related to and based upon his average weekly wage. See 33 U.S.C.A. § 910.

The memorandum of the second informal conference, signed by the Claims Examiner, a copy of which was sent to Belton, recites that compensation is payable at the rate of $36.00 per week and contained a warning to the employee that he has one year from the last date of payment to request a modification in the event of an increase in disability.[3] Subsequently, the Claims Examiner in the office of the Deputy Commissioner sent Belton an official form (Form US–212) containing the following:

"You were paid compensation for disability as follows:

|  | Amount |
| --- | --- |
| "Temporary total from 7/17/61 to 10/23/61 at $36.00 a week | $509.14 |
| * * * | |
| "Permanent partial from 10/23/61 to 11/30/62 at $36.00 a week | $2,072.57 |
| * * * | |

*"If the facts in your case are as indicated above, you have received the amount of compensation payment to which you are entitled under the law, and the case will be closed in the files of this office."* (Emphasis added.)

After Belton consulted counsel sometime during 1964, he made claim for compensation on the basis of the true average weekly wage of $100.00 rather than the incorrect $54.00 per week wage which had been reported by Old Dominion to the Deputy Commissioner.

Why did Old Dominion report to the Deputy Commissioner that Belton's average weekly wage was $54.00 when its own records showed that his average weekly wage with Old Dominion alone was $78.10, and it now willingly stipulates that the total average weekly wage (including earnings from other employers) was $100.00? The explanation, not in controversy, is crucial to our decision. It was not a matter of mistake. Hampton Roads Maritime Association, an employers' association of which Old Dominion was a member, and the International Longshoremen's Association had a written agreement beginning July 1, 1957, and purportedly expiring September 30, 1959, which undertook to fix the average weekly wages for longshoremen at $54.00 for compensation rate purposes. After September 30, 1959, the agreement lapsed by its terms but employers of longshoremen continued to operate under it until late 1963. Indeed, the record suggests that some employers continue presently to operate under this agreement, despite written cancellation of it by the Union on November 4, 1963.

This astounding agreement recites that its purpose is "the fixation of a uniform rate of compensation to be paid injured employees when found entitled to compensation under the provisions of the Longshoremen's and Harbor Workers' Compensation Act." It provides that the average weekly wage of longshoremen "shall be considered" as $54.00 per week, and that the rate of compensation to be paid all union members while employed as longshoremen under circumstances entitling them to compensation within the provisions of the Longshoremen's and Harbor Workers' Compensation Act "shall be $36.00 per week." The agreement further provides that it is consummated by the parties with the un-

1. International Longshoremen's Association, Local 846.

2. Liberty Mutual's claims adjuster testified "to the best of my knowledge, there was no discussion * * *."

3. The possibility of a modification for any other reason was not suggested. Belton claims no increase in disability.

derstanding that it shall become and remain effective when, if, and for so long a time as it shall have the "acceptance" of the United States Department of Labor, Bureau of Employees' Compensation.

More astounding than the agreement itself is the fact that it *was* "accepted" by the then Deputy Commissioner,[4] Fifth Compensation District of the Bureau of Employees' Compensation.

The effect of the agreement, if valid, was to make true average weekly earnings irrelevant and to permit employers to ignore actual average weekly earnings and report $54.00 per week for all injured longshoremen.

It is urged upon us that there were many valid reasons for effecting such a scheme. Old Dominion and Liberty Mutual, joined to some extent by the Deputy Commissioner, maintain that the result is "fair". Fair to whom? It is insisted that although high-earning longshoreman Belton "lost", that other low-earning longshoremen "gained" and that the net result was an equitable one. Liberty Mutual and Old Dominion further insist that some such arrangement is simply necessary because longshoremen work for many employers in the course of a year and reconstructing their work records and computing their true average weekly wage is difficult to accomplish.

Belton says this is not so. His assertion is partly corroborated by Old Dominion's own records showing his average weekly wages to be $78.10. Belton represents that since 1950 the Hampton Roads Maritime Association (the employers' group) has maintained a central records bureau to which each employer reports all hours worked for each individual longshoreman every quarter. It is suggested that this data is kept current and that all that Old Dominion had to do to determine Belton's true average weekly earnings was place a telephone call and make the inquiry.

■ We need not decide whether such a communal agreement is either "fair" or "necessary" for the simple reason that it is plainly unlawful. Neither the Union nor the employers' association nor the Deputy Commissioner had the power to barter away Belton's statutory right to compensation. This is so for the reason that the Congress, with exceptions not pertaining here, has provided that "the average weekly wage of the injured employee at the time of the injury *shall* be taken as the basis upon which to compute compensation * * *." 33 U. S.C.A. § 910 (Emphasis added). This is mandatory. There is no room for construction. That the Congress meant what it said is exemplified by subsequent clauses of the same section spelling out in great detail the method of determining the average weekly wage.

At a hearing before the Deputy Commissioner on June 22, 1965, that officer apparently took the position that the illegal employer-Union agreement substituting an agreed upon average wage for the true one required by the statute was an irrelevant circumstance. The Deputy Commissioner states in the record that the agreement was never "approved" by the Bureau. In the very next sentence, he noted, however, that it *had* been "accepted" by the Bureau. We are unable to make such a nice distinction, nor is it urged upon us on appeal.

■ Plainly the former Deputy Commissioner became a party to an illegal agreement making actual average weekly earnings irrelevant to computation of benefits. Worse, he then represented to Belton that he had received "the amount of compensation payment to which you are entitled under the law" when the then Deputy Commissioner knew that the payment was an arbitrary one not sanctioned by statute.

The Deputy Commissioner and Old Dominion and its carrier knew that Belton had a right to compensation on the basis of his actual average weekly wage. There is nothing in the record to indicate that Frank Belton knew it, and it is clear that he certainly did not learn it from the

---

4. Not the present respondent John P. Traynor.

Claims Examiner or the then Deputy Commissioner.

Under these circumstances, the contention of the Deputy Commissioner that it is just to rigidly apply the limitations statute because the burden of proof of the weekly wage was upon Belton, and he is presumed to know his own wages, and failed to sustain his burden of proof within the limitation period is not persuasive. This is so because it is clear that Belton failed to appreciate the significance of the relevant facts and his failure is attributable to the conduct of the then Deputy Commissioner in "accepting" an illegal agreement supplanting the terms of the statute. A quasi-judicial officer, such as the Deputy Commissioner, cannot fault a claimant for failing to prove what has already been made irrelevant by an illegal agreement "accepted" by him.

But all three respondents insist that regardless of the circumstances, and whether just or not, Belton's claim for additional compensation is barred by the statute of limitations contained in the Act. It is urged that compliance with the limitation period is "jurisdictional" so that Belton's failure to seek further compensation for more than a year after the date of his last payment results in a lack of jurisdiction in the Deputy Commissioner and in the district court to consider the merits of his claim. This denomination of the problem as "jurisdictional" is no more, we think, than not so new raiment for the very old proposition that some statutes of limitation are "substantive" rather than "procedural." See 34 Am.Jur. Limitation of Actions § 7 (1941); compare Id. § 11.

■ Even where the time limitation is fixed by the same statute which creates the cause of action, the modern trend is to extend or toll the period of limitation to avoid injustice. Travelers Ins. Co. v. Cardillo, 225 F.2d 137 (2d Cir. 1955). The three year period fixed by the Federal Employers' Liability Act [5]

may be extended if the defendant misled the plaintiff into believing he had a longer period within which to sue because "no man may take advantage of his own wrong." Glus v. Brooklyn E. Dist. Terminal, 359 U.S. 231, 233, 79 S.Ct. 760, 762, 3 L.Ed.2d 770 (1959); see generally Northern Metal Co. v. United States, 350 F.2d 833, 837–838 (3d Cir. 1965). And the misrepresentation need not have been made fraudulently. Scarborough v. Atlantic Coast Line R. R., 202 F.2d 84, 86 (4th Cir. 1953). The United States Supreme Court has recently had occasion to say that the question of whether a statute of "limitations is to be tolled, is one 'of legislative intent whether the right shall be enforceable * * * after the prescribed time.' Classification of such a provision as 'substantive' rather than 'procedural' does not determine whether or under what circumstances the limitation period may be extended." Burnett v. New York Cent. R. R., 380 U.S. 424, 426–427, 85 S.Ct. 1050, 1053, 13 L.Ed.2d 941 (1965) (citation & footnote omitted).

The Longshoremen's and Harbor Workers' Compensation Act itself requires the employer to report the facts of injury to the Secretary of Labor. The employer is to report specifically such things as his own name and address and the name and address of the employee, the cause and nature of the injury, and "such other information as the Secretary may require." 33 U.S.C.A. § 930.

Implementing the statute, the Secretary adopted an appropriate regulation requiring that "the employer shall send to the Deputy Commissioner for the compensation district in which occurrences took place *upon a form prescribed for that purpose by the bureau,* a report of such injury * * *." 20 C.F.R. § 31.3. The Secretary further provided by regulation that "[f]orms for use under the Longshoremen's Act are as follows: * * * US–202, Employer's first report to Deputy Commissioner of accident or occupational disease." 20 C.F.R. § 1.13.

---

5. There is some question as to whether F.E.L.A. creates a new cause of action or modifies one existing at common law.

It was this form, referred to hereinabove, on which Old Dominion initially reported to the commissioner that Belton's average weekly wage was $54.00 when in truth it was $100.00.

■ Since the employer's report misrepresented the longshoreman's average weekly wage, it did not conform with the statutory duty on the employer to furnish information. We think it may be implied that the Congress requires of employers correct information, to the extent known or reasonably ascertainable, and that the furnishing of false information, whether by reason of an agreement with a labor union or otherwise, is not a sufficient compliance with the statute.

■ It is provided in the Act that where the employer "fails, neglects, or refuses to file [a] report * * * the limitations * * * shall not begin to run against the claim * * * *until* *such report shall have been furnished as required* * * *." 33 U.S.C.A. § 930 (f) (emphasis added). We think Old Dominion failed to file a report "as required" by 33 U.S.C.A. § 930(a) because the report required to be filed by this section is a reasonably accurate one, and the report filed by Old Dominion was incorrect with respect to the average weekly wage of Belton. The proviso of the statute, therefore, operates. By its terms, the one-year limitation period in 33 U.S.C.A. § 913(a) does not begin to run until a report is furnished as required by Section 930(a) of the Act. Compare Antio v. Proksch Construction Co., 377 Mich. 517, 141 N.W.2d 81 (1966).

■ We find nothing in the citation of authorities by respondents militating against this result. This is not the first time a court has found it necessary in the interest of justice to extend the one-year limitation period of the Longshoremen's and Harbor Workers' Compensation Act. See Travelers Ins. Co. v. Cardillo, 225 F.2d 137 (2d Cir. 1955).

Statutes of limitation are designed to assure fairness to defendants—not to permit a defendant to profit from his own wrong. Such statutes are thought to promote justice by preventing revival of stale claims so old that evidence has been lost, memories have faded, and witnesses have disappeared. No such factors exist here. It is not suggested that Old Dominion or its carrier have been harmed by the delay. Nor would such a result be likely, for the burden of proving average weekly wage remains on the claimant. The policy of repose is not infrequently outweighed by more compelling principles.

*Query* whether the conduct of respondents is sufficient to estop them from pleading the statute of limitations? As the Supreme Court said in Honda v. Clark, 386 U.S. 484, 87 S.Ct. 1188, 18 L.Ed.2d 244, 254 (1967), "[W]e do not reach the estoppel issue, because we hold that the statutory scheme itself requires tolling the limitation period * * *."

Respondents urge, somewhat in terrorem, that Belton must be denied relief because to do otherwise might unsettle numerous old claims. It is suggested that to relieve Belton of the bar of the statute of limitations will open Pandora's box; that there may be hundreds of other longshoremen in a like situation. We do not disparage the contention. Appellate courts are not so far removed from the affairs of life that the practical impact of a decision should be ignored, and we have carefully considered the possibly disruptive effect of our decision. But we are not persuaded that because others may have been wronged, Belton should be denied relief. Finality of claims administration is not the only desideratum.

■ Finally, since the Deputy Commissioner will, on remand, resume the administrative proceedings, we think it appropriate to note our conception of his proper role [6] under the Longshore-

---

6. The Bureau's own regulations recognize that a Deputy Commissioner performs "the quasi-judicial function of deciding the rights of private parties—the employee or his dependents (as the claimant or claimants) and the employer, or em-

men's and Harbor Workers' Compensation Act. He is not a disinterested bystander. Nor is his role an adversary one. In Wheeling Corrugating Co. v. McManigal, 41 F.2d 593, 595 (4th Cir. 1940), Judge Parker said for this court:

"The statute establishes a comprehensive plan of compensation and *intrusts* the administration of same to the United States Employees' Compensation Commission. It fixes the amount of compensation to be awarded in accordance with the rate of wages being received." (Emphasis added.)

The order of the district judge is reversed. On remand, the order of the Deputy Commissioner rejecting Belton's claim for additional compensation will be vacated. The Commissioner will thereupon conduct further proceedings and enter an appropriate order to assure that claimant Belton receives the amount of compensation to which he is entitled under the Act.

Reversed.

ployer and his insurance carrier (as respondent or respondents) * * * This function is quasi-judicial in character * * *." 20 C.F.R. § 02.1(a).